UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES SECURITIES<br>AND EXCHANGE COMMISSION<br>100 F. Street, N.E.<br>Washington, DC 20549,<br><br>    Plaintiff,<br><br>  v.<br><br>NETEASE.COM, INC.,<br><br>    Defendant. | Civil Action No. |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("Commission") alleges the following:

## SUMMARY

1. NetEase.com, Inc. ("NetEase") is an Internet company with its principal operations in China. In June 2000, NetEase raised $65 million through an initial public offering in the United States. During 2000 and 2001, NetEase employees circumvented the company's internal accounting controls and falsified the company's books and records in connection with hundreds of advertising and e-commerce contracts. NetEase then recorded revenue from the transactions in a manner that did not conform with U.S. Generally Accepted Accounting Principles ("GAAP"). As a result, NetEase materially overstated its revenue and made numerous false and misleading statements about its financial condition in annual and periodic reports filed with the Commission and in other public statements, including earnings releases.

2.   NetEase used three principle techniques to circumvent controls and improperly inflate revenue:

   a.   Shifting revenue into earlier quarters by bifurcating advertising arrangements with customers into two contracts, one with an artificially shortened contract term and the other requiring the provision of "free" advertising for the remainder period. By recognizing revenue over the shorter time-period and failing to disclose the existence of the "free" contracts to its independent auditors, NetEase concealed its improper revenue recognition from investors;

   b.   Recognizing fictitious revenue in connection with advertising contracts that had not been consummated or when no services were performed; and

   c.   Recognizing revenue in connection with undisclosed barter arrangements that lacked economic substance.

3.   As a result, NetEase materially overstated its revenue for fiscal 2000 and the first quarter of 2001. In doing so, NetEase violated the reporting, books and records, and internal controls provisions of the federal securities laws. The Commission requests, among other things, that NetEase be enjoined from further violations of the federal securities laws as alleged herein.

## JURISDICTION

4.   This Court has jurisdiction over this action pursuant to Sections 21(d) and 27 of the Securities Exchange Act of 1934 ("Exchange Act").

5.   Defendant NetEase, directly or indirectly, has made use of the means and instrumentalities of interstate commerce, or of the mails, or of the facilities of a national

securities exchange in connection with the acts, practices, and courses of business alleged herein.

## THE DEFENDANT

6. NetEase is a Cayman Island corporation established in July 1999 to conduct an Internet portal business in China. During the relevant time, NetEase offered a wide range of Internet services to Chinese Internet users including news, email, instant messaging, chat rooms and online auctions, and had approximately 250 employees operating through offices in Beijing, Shangau and Guangzhou, China. In June 2000, NetEase raised $65 million in its initial public offering in the United States. NetEase's American Depositary Shares ("ADS") are registered with the Commission pursuant to Section 12(g) of the Exchange Act and trade on the Nasdaq Stock Market under the ticker symbol NTES.

## FACTS

## INTRODUCTION

7. In April 2001, a potential purchaser of NetEase identified a large amount of past due accounts receivable balances and questioned NetEase's revenue recognition practices. As a result, NetEase's audit committee conducted an internal investigation to determine whether NetEase's financial statements were prepared in accordance with GAAP.

8. The internal investigation concluded that NetEase materially overstated its revenue due to widespread circumvention of internal accounting controls over five fiscal quarters in connection with hundreds of contracts and at least fifty customers. Specifically, the audit committee found that for the fiscal year ended December 31, 2000,

NetEase inflated revenue by $4.3 million, or 109%, and, that NetEase inflated revenue by approximately 5%, 36%, 138%, 290% and 116% for the fiscal quarters ended March 31, June 30, September 30 and December 31, 2000, and March 31, 2001, respectively. In light of these findings, NetEase restated its previously reported fiscal year 2000 financial results and corrected, before public dissemination, its financial results for the quarter ended March 31, 2001.

## IMPROPER REVENUE RECOGNITON AND CIRCUMVENTION OF INTERNAL ACCOUNTING CONTROLS

9. GAAP generally permits revenue recognition for an advertising arrangement if a contract was executed, the advertising service was performed and the collection of the associated account receivable is probable.

10. NetEase established a system of internal accounting controls in 2000 that segregated revenue recognition controls among three departments – Sales, Contracts and Finance. The Sales Department was responsible for negotiating contracts. The Contracts Department was responsible for signing contracts, arranging for advertising placements on NetEase's website and completing documents evidencing that the advertising was done. The Finance Department was responsible for affixing NetEase's corporate seal and approving the contracts, and for preparing revenue recognition journal entries. The system did not provide reasonable assurances that NetEase actually performed the advertising, and NetEase failed to maintain the system by verifying whether employees were complying with it.

11. NetEase employees in these departments circumvented this system of internal controls to materially overstate revenue, using the following three principal techniques:

4

      a.      Improperly shifting revenue into earlier quarters;

      b.      Recording fictitious revenue in situations in which NetEase had not performed any services; and

      c.      Recording revenue in connection with barter arrangements lacking economic substance.

### Shifting Revenue into Earlier Quarters

12. NetEase improperly shifted approximately $1.1 million in revenue into earlier quarters using a technique that employees referred to as "revenue-brought-forward." Revenue-brought-forward involved artificially bifurcating advertising arrangements into two contracts in order to recognize revenue over a shortened contract term. For example, an arrangement having a six-month term was divided into two contracts, one having a three-month term and another "bonus contract" for which NetEase provided "free" services for three additional months. Contrary to GAAP, NetEase recognized revenue over the shortened three-month period instead of the true term of six months. NetEase concealed the bonus contracts from its independent auditors and improperly accelerated revenue from these advertising arrangements into earlier quarters.

### Fictitious Revenue When Services Not Performed

13. NetEase improperly recognized approximately $1.1 million in revenue in connection with contracts for which NetEase did not perform any services. This category of misstatements included situations in which NetEase recognized revenue even though: (1) NetEase had not executed any advertising agreement with a customer; (2) NetEase only had received a signed "commitment" contract, expressing the customer's intent to

purchase services from NetEase in the future; or (3) NetEase had executed a contract with a customer but had not performed any advertising services. Because no services had been performed by NetEase, the revenue it recognized in connection with the arrangement was fictitious and did not comply with GAAP.

Barter Arrangements Lacking Economic Substance

14.     NetEase improperly recognized approximately $2 million in revenue for 2000 in connection with barter arrangements with customers that lacked economic substance. NetEase failed to disclose to its auditors these barter arrangements, which were designed to financially offset each other.

15.     One such barter arrangement involved Kingsoft, one of China's largest PC software vendors, and Joyo.com, a related party. This arrangement purportedly involved NetEase hosting an online shopping mall for Joyo.com and NetEase purchasing dictation software from Kingsoft. The $330,000 in revenue from the Joyo.com contracts that NetEase recognized in the third quarter of 2000 made up approximately 33% of the revenue shortfall that NetEase had experienced only two weeks before the end of the quarter.

16.     In October 2000, after the third quarter had ended, a NetEase employee informed NetEase's then-CFO about the Joyo.com contracts, dated July 10 and August 15, 2000. The CFO approved NetEase's recognition of revenue from the contracts as of September 30, 2000, without doing any due diligence to determine whether the contracts had been backdated or whether the contracts represented legitimate third quarter sales. The CFO also represented to NetEase's independent auditors that the contracts were for legitimate third quarter sales. In fact, the contracts had been signed by NetEase and

Joyo.com after the quarter had ended. NetEase recognized the revenue from the Joyo.com contracts in the third quarter of 2000, even though it never performed any e-commerce services. Likewise, Kingsoft never provided the software to NetEase. In its restatement, NetEase reversed the $330,000 in revenue because the arrangement lacked economic substance.

17.   Another example of a barter arrangement in which NetEase improperly recognized revenue involved a fourth quarter 2000 arrangement with Techpacific.com ("Techpacific"), a key NetEase shareholder before NetEase's initial public offering in the United States. The arrangement called for NetEase to sell $50,000 in advertising to Techpacific and for Techpacific to sell $50,000 of financial advisory services to NetEase. The $50,000 fee helped NetEase close the gap on its revenue shortfall for the fourth quarter of 2000 and falsify revenue growth.

18.   NetEase's then-CFO signed the advertising agreement, which was dated December 2000, and signed and negotiated the financial advisory services contract, which was dated January 2001 (the next quarter). The CFO was aware that NetEase's independent auditors would audit the $50,000 in revenue recognized from the advertising contract with Techpacific, but did not inform them about the financial services contract so that the auditors could consider that fact in making a judgment about whether NetEase's revenue recognition on the advertising contract was appropriate. In addition, the advertising contract was modified by a supplementary contract signed by another NetEase employee to include a "revenue-brought-forward" element, which required NetEase to provide free advertising services after December 31, 2000. NetEase did not

disclose this "bonus" contract to NetEase's auditors, thus facilitating NetEase's premature recognition of the revenue in 2000.

19. Similar to the Kingsoft/Joyo barter arrangement, NetEase did not provide any advertising services and Techpacific did not provide any genuine financial advisory work. In its restatement, NetEase reversed the $50,000 of revenue recorded for the advertising purportedly done for Techpacific.

20. All three NetEase departments responsible for revenue recognition participated in the scheme. The Contracts Department, which was responsible for arranging provision of the services, prepared reports falsely showing that NetEase had performed the advertising. The Finance Department, which stamped both sets of contracts with a company seal, prepared revenue recognition journal entries using false performance records. Finally, the Sales Department artificially bifurcated sales arrangements into two contracts to accelerate revenue into earlier quarters. To identify which contracts to conceal from the auditors, employees marked the initial contracts with the prefix "G" and the bonus contracts with the prefix "Z."

## FALSE FINANCIAL RESULTS

21. As a result of its improper revenue recognition, NetEase publicly disseminated materially false and misleading financial results for the quarters ended March 31, June 30 and September 30, 2000, and the quarter and year ended December 31, 2000, as follows:

   a. First Quarter Ended March 31, 2000 – NetEase's registration statement for its June 30, 2000 IPO, which was filed with the Commission on June 29,

2000, included financial statements for the quarter ended March 31, 2000 that overstated quarterly revenue by approximately 5%.

        b.      Second Quarter Ended June 30, 2000 – NetEase's earnings press release issued on July 31, 2000, and Form 6-K furnished to the Commission on or about August 3, 2000, overstated second quarter revenue by approximately 36%. The earnings release also falsely claimed 102.5% revenue growth over the previous quarter. The restated results reflect 56.3% growth.

        c.      Third Quarter Ended September 30, 2000 – NetEase's earnings press release issued on October 31, 2000, and Form 6-K furnished the same day, overstated quarterly revenue by approximately 138%. The press release falsely claimed revenue growth of 47.4% over the previous quarter and a 539% increase over the same quarter in the prior year. The restated results reflect a 15.9% decline in revenue from the previous quarter and a 169% increase from the prior year's quarter.

        d.      Fourth Quarter Ended December 31, 2000 – NetEase's earnings press release for the quarter and year ended December 31, 2000 (issued on March 1, 2001), and Form 6-K furnished to the Commission the same day, overstated quarterly revenue by approximately 290% and annual revenue by 109%. The earnings release claimed fourth quarter revenue growth of 24.6% over the previous quarter and a 159% increase over the same quarter in the prior year. The release also claimed that full year 2000 revenue increased 311% over the prior year. The restated fourth quarter results reflect a 24% drop from the previous quarter, a 33.6% drop from the prior year's quarter, and the restated full year results reflect a 96.6% increase from the prior year. NetEase

falsely attributed increases in its advertising revenue to a continued increase in the number of advertisers as well the size of their purchases.

      e.    Year Ended December 31, 2000 – NetEase's glossy annual report for fiscal 2000, which was disseminated to investors on or about April 1, 2001, with the company's proxy materials, overstated full year revenue by $4.3 million, or 109% ($4.0 million versus $8.3 million), understated its net loss by $3.2 million, or 16% (-$20.5 million versus -$17.3 million) and understated its ADS loss per share by $.13, or 15.9% (-$.82 versus -$.69). The glossy annual report falsely represented that NetEase's annual advertising revenue grew by 456% ($1.3 million to $7.3 million). The company's annual report on Form 20-F for fiscal 2000, which was filed with the Commission on August 31, 2001, included corrected financial results (based upon the August 2001 restatement).

## FIRST CLAIM

Violations of Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and
Rules 12b-20 and 13a-16 [17 C.F.R. §§ 240.12b-20, 240.13a-16] Promulgated Thereunder

22.    Plaintiff realleges and incorporates herein by reference paragraphs 1 through 21 above.

23.    Section 13(a) of the Exchange Act and Rule 13a-16 require issuers with securities registered under Section 12 of the Exchange Act to file reports with the Commission and to keep this information current. The obligation to file such reports embodies the requirement that they be true and correct. Exchange Act Rule 12b-20 further requires that such reports contain any additional information necessary to ensure that the required statements in the reports are not, under the circumstances, materially misleading. Information regarding the financial condition of a company is presumptively

10

material. Financial statements in Commission filings that do not comply with GAAP are presumed to be misleading. Regulation S-X, 17 C.F.R. 210.4-01(a)(1).

24.    By reason of the foregoing, NetEase violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-16 [17 C.F.R. §§ 240.12b-20, 240.13a-16] promulgated thereunder.

## SECOND CLAIM

Violations of Sections 13(b)(2)(A), 13(b)(2)(B) and 13(b)(5) of the Exchange Act
[15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(2)(B) and 78m(b)(5)]
and Rule 13b2-1 [17 C.F.R. § 240.13b2-1] Promulgated Thereunder

25.    Plaintiff realleges and incorporates herein by reference paragraphs 1 through 24 above.

26.    Section 13(b)(2)(A) of the Exchange Act requires Section 12 registrants to make and keep books, records and accounts that accurately and fairly reflect the transactions and dispositions of their assets. Section 13(b)(2)(B) of the Exchange Act requires such registrants to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain the accountability of assets. Section 13(b)(5) of the Exchange Act provides that no person shall knowingly falsify any such book, record or account or circumvent internal controls. In addition, Rule 13b2-1 also prohibits the falsification of any book, record or account subject to Section 13(b)(2)(A).

27.    By reason of the foregoing, NetEase violated Sections 13(b)(2)(A), 13(b)(2)(B) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(2)(B) and 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1] promulgated thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

A.  Granting a permanent injunction restraining and enjoining Defendant NetEase from violating the statutory provisions set forth herein, and

B.  Granting such other relief as this Court may deem just and proper.

Respectfully submitted,

Michael K. Lowman (Bar. No. 460190)
Antonia Chion
Kara N. Brockmeyer
Robert A. Cohen

Attorneys for Plaintiff
Securities and Exchange Commission
100 F. Street, N.E.
Washington, DC 20549
(202) 551-4477 (Lowman)
(202) 551-4869 (Cohen)

Dated: February 27, 2006